# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**LAURA A. PADGETT,**

        Plaintiff-Claimant,

        -vs-                                Case No. 14-C-591

**CAROLYN W. COLVIN**
**Acting Commissioner of Social Security,**

        Defendant-Respondent.

## DECISION AND ORDER

Plaintiff-Claimant Laura A. Padgett ("Padgett") appeals the final decision of the acting Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. The Administrative Law Judge ("ALJ"), who conducted a hearing, found that Padgett's multiple sclerosis ("MS")[1] is a severe impairment and that her other

---

[1] Padgett has been diagnosed with relapsing-remitting MS ("RRMS"), the most common disease course, which is explained as follows:

> RRMS is characterized by clearly defined attacks of worsening neurologic function. These attacks—also called relapses, flare-ups or exacerbations—are followed by partial or complete recovery periods (remissions), during which symptoms improve partially or completely and there is no apparent progression of disease. Approximately 85 percent of people with MS are initially diagnosed with relapsing-remitting MS. . . . The most common symptoms reported in RRMS include episodic bouts of fatigue, numbness, vision problems, spasticity or stiffness, bowel and bladder problems, and problems with cognition (learning and memory or information processing). People with progressive forms of MS are more likely to experience gradually worsening problems with walking and mobility,

alleged impairments of migraine headaches, depression, and adjustment disorder with anxiety are non-severe, and that she does not have an impairment or combination of impairments that meet or equal the listing of impairments found at 20 C.F.R. Part 404, Subpart P, App. 1.  He further found that Padgett has a residual functional capacity ("RFC") for sedentary work with occasional postural limitations, which would allow her to perform her past relevant work as a receptionist.  Alternatively the ALJ found that based on Padgett's age, education, work experience, and RFC, other substantial gainful employment as an order clerk, bench assembler or office worker would be available in significant numbers in the national economy. The Appeals Council denied review of the ALJ's decision, making it the final determination of the Commissioner.  20 C.F.R. § 404.981; *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).

Padgett contends that the ALJ failed to properly consider her fatigue and need for rest/naps; improperly dismissed the RFC assessment of treating psychologist Sarah Hanson, Ph.D. ("Hanson"); and erroneously discounted the statements and testimony of her husband, father, and aunt.  These issues are closely related in that each played a role in the ALJ's discounting of the

---

along with whatever other symptoms they may have.

*See* http://www.nationalmssociety.org/What-is-MS/Types-of-MS/Relapsing-Remitting-MS

MS-caused functional limitations on Padgett's ability to work.

To uphold the denial of benefits, the ALJ's decision must be supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004). To determine whether substantial evidence exists, the Court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley v. Colvin,* 758 F.3d 834, 836-37 (7th Cir. 2014). An ALJ's credibility determination is entitled to "special deference." *Schomas,* 732 F.3d at 708. The Court will reverse an ALJ's credibility finding only if it is patently wrong. *See Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013) (noting that the ALJ must adequately explain his credibility finding).

This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must articulate at least minimally his analysis of all relevant evidence, *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994), and "the [ALJ's] decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues," *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Additionally, the ALJ must "build an accurate and logical bridge from the

evidence to his conclusion." *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

A discrepancy between the reported complaints and the medical evidence is probative that a witness may be exaggerating her condition. *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir. 2000). An applicant for disability benefits may "have an incentive to exaggerate [her] symptoms," and therefore, "an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006).

Fatigue is a common symptom of MS. *Milliken v. Astrue,* 397 F. App'x 218, 223 (7th Cir. 2010) (citing National Multiple Sclerosis Society, What we know about MS, http://www.nationalmssociety.org/about-multiple-sclerosis/what-we-know-about-ms/symptoms/index.aspx (last visited Oct. 8, 2010)). However, the fact that fatigue is a common symptom of MS, "reveals nothing about the severity, intensity, or persistence of fatigue that any individual may experience at a particular point in time." *Id.* (citing National Multiple Sclerosis Soc., *supra* (indicating that MS symptoms can change over time)).

The ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," SSR 96-8p, based upon medical evidence as well as "other evidence, such as testimony by the

- 4 -

claimant or his friends and family," *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). *See* 20 C.F.R. § 404.1529(a) (in making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how her symptoms affect her daily life and ability to work). An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski,* 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004).

Much of the ALJ's decision rests upon his statement "after careful consideration of the evidence, the undersigned finds that although the claimant's medically determinable impairment could reasonably be expected to cause some of the symptoms of the types alleged, her and her husband's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below." (Tr. 26.) The ALJ goes on to explain his conclusion that the medical evidence does not

fully substantiate Padgett's allegations of disabling symptoms. However, the ALJ's discussion of the medical evidence is selective.

An ALJ is not required to give the treating opinion controlling weight. However, the ALJ must provide a sound explanation for a decision to reject the treating physician's opinion and to accept an alternate opinion. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). Moreover, even when an ALJ offers good reasoning for refusing to give controlling weight to a treating physician's opinion, he must still decide what weight to give that opinion. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

The ALJ stated that "treating providers have consistently noted that her symptoms are stable." (Tr. 26.) As demonstrated by the summary of her treating neurologist and department director Dr. Bhupendra O. Khatri's ("Khatri") progress notes, the ALJ's statement overgeneralizes.

In August 2009, Padgett saw Khatri for an initial consultation regarding her MS. She was medicated with Avonex1.[2] (Tr. 241-43.)

---

[2] The National MS Society provides the following description of Avonex:

> Avonex® is a medication manufactured by a biotechnological process from one of the naturally-occurring interferons (a type of protein). . . . In controlled clinical trials in relapsing MS, those taking the medication had a reduced risk of disability progression, experienced fewer exacerbations, and showed a reduction in number and size of active lesions in the brain (as shown on MRI) when compared with the group taking a placebo. In a subsequent study of patients who had experienced a single demyelinating

On March 11, 2010, Padgett advised Khatri that the MS had been stable, but recently she had been having double vision "mostly during the evening time intermittently" which was associated with "urinary frequency and fatigue." (Tr. 241.) Those problems are not mentioned by the ALJ. Nor did the ALJ mention that Padgett was unable to perform a tandem walk. (Tr. 242.) Khatri also advised Padgett to enroll in an exercise program. (Tr. 243.)

On April 19, Khatri commented that Padgett's MS was stable and that examination was normal—Padgett was able to walk on her toes and heels and "could do tandem gait quite well." (Tr. 239.) Again on September 22, Khatri noted that overall Padgett was "doing quite well." (Tr. 245.)

However, on October 11, Padgett was seen on a semi-emergency basis due to the onset of double vision (diplopia) lasting from ten minutes to an hour, which seemed to be worse with long-distance viewing. (Tr. 255.) Cranial nerves II-XII showed very subtle disconjugate eye movements. An MS exacerbation was diagnosed, and a three-day course of IV (intravenous) steroids was prescribed with a follow-up visit on the third day. (Tr. 256.)

---

> event in the optic nerve, spinal cord, or brainstem, and had lesions typical of MS on brain MRI, Avonex significantly delayed the time to a second exacerbation, and thus to a clinically definite diagnosis of MS.

*See* http://www.nationalmssociety.org/Treating-MS/Medications/ (last visited September 22, 2015.)

- 7 -

On October 19, Khatri reported that the MS was stable, with the double vision having been resolved. (Tr. 253.) However, he also noted fatigue and weakness. (*Id.*)

Khatri next saw Padgett on December 1, when she reported that the double vision was better, but she had increasing urgency with bowel and bladder with occasional accidents, increased difficulty walking and balance, tingling on and off in her bilateral lower extremities, and increased fatigue. (Tr. 249.) Speech, swallowing, and chewing were unchanged. Khatri noted that Padgett's MS symptoms were worsening despite Avonex and the three-day steroid course, discussed changing her therapy to Tysabri or another drug, and indicated he needed an MRI, presumably to further assess her condition. (Tr. 250.)

On December 15, Khatri noted that two weeks after Padgett's blurred vision resolved, she was having more falls and had developed numbness, tingling, pain in her extremities, bladder frequency, urgency, and hesitating, and had experienced five episodes of bowel incontinence. (Tr. 247.) He also found that although Padgett could walk without assistance, her gait was "mildly wide-based" and she had some decreased strength in the motor system exam and deep tendon reflexes. (*Id.* at 248.) He reported that an

- 8 -

Case 2:14-cv-00591-PP   Filed 09/30/15   Page 8 of 18   Document 20

October 2010 brain MRI[3] "show[ed] multiple areas of increased signal intensity with brainstem involvement not noted in prior MRI results." (*Id.*) The ALJ does not mention this test or Khatri's diagnosis of MS "worsening clinically and radiographically." (*Id.*) The plan was to switch Padgett to Tysabri.[4]

On January 6, 2011, Khatri wrote a letter stating that Padgett was "unable to work due to numbness, tingling and pain in her lower extremities, bladder problems, and falling, which are related to her [MS]." (Tr. 280.)

On January 13, Padgett received an IV Tysabri infusion. (Tr. 258.) Khatri noted that Padgett denied any new problems; however, he found decreased sensation at the toes bilaterally, and decreased power in the lower extremities bilaterally. He also noted fatigue and weakness.

---

[3] The October 2010 date cited in Khatri's report may be a typographic error. The record contains a report of a December 8, 2010, MRI (Tr. 262-63), and Khatri's report of his December 1 examination states that he needed an MRI and would see Padgett two weeks after the MRI to discuss the scan and the treatment options. (Tr. 250.)

[4] The National MS Society website describes Tysabri as follows:

> Tysabri® is a laboratory-produced monoclonal antibody. It is designed to hamper movement of potentially damaging immune cells from the bloodstream, across the "blood-brain barrier" into the brain and spinal cord. Tysabri is approved by the U.S. Food and Drug Administration (FDA) as a monotherapy (not to be used in combination with other disease-modifying therapies) to treat relapsing forms of MS.

*See* http://www.nationalmssociety.org/Treating-MS/Medications (last visited September 22, 2015.)

- 9 -

On February 10, Padgett received IV Tysabri. (Tr. 260.) Padgett had numbness and tingling in both legs, "[d]iplopia, blurry vision" urgency but only incontinence once during the preceding month. Results of the neurological evaluation were slightly changed, and decreased sensation at the toes bilaterally was noted.

On March 10, Padgett received IV Tysabri. (Tr. 268.) She reported she was forgetful at times but improved overall. (*Id*.)

On April 14, she received her fourth IV Tysabri infusion. Padgett reported having headaches and difficulty sleeping, but her MS symptoms were stable. (Tr. 269.) Khatri reported that Padgett denied any new numbness, tingling, or weakness, although she continued to have numbness and tingling in both legs. (Tr. 283.) Fatigue and memory were unchanged, she had chronic blurry vision but no double vision, urinary urgency but no incontinence, deceased vibratory sense at bilateral toes, and deep tendon reflexes were hypoactive. He noted relapsing remitting MS and cognitive decline, directing Padgett to get a cognitive evaluation to provide a baseline and repeat in a year or two to see if there was any worsening. (Tr. 284.)

On April 30, Padgett reported that the MS was stable, she had no weakness, her bladder and bowel function was normal, she had no pain; however, her memory was impaired. (Tr. 281.) Sensory examination and tone were normal. Padgett could walk independently, and could walk on her

- 10 -

toes, heels and tandem gait. Khatri reported diagnoses of severe relapsing form of MS–better with Tysabri, and fatigue and weakness.

In June 2011, Mina Khorshidi ("Khorshidi"), M.D., a non-treating, non-examining internist, completed a RFC form, finding Padgett's statements to be credible and that she could perform sedentary employment. (Tr. 270-77.) Khorshidi noted that although Padgett's October 2010 exacerbation resolved quickly, her December 2010 exacerbation did not completely resolve with Avonex and IV steroids, and a brain MRI showed worsening of the MS, so Padgett's medication was changed to Tysabri and she improved. (Tr. 277.) She noted that Padgett had blurry vision, urinary urgency, numbness/tingling in both legs, and reported having fatigue and low energy, particularly with prolonged standing and walking. (*Id*.) In October 2011, Pat Chan, M.D., a non-treating, non-examining physician, stated that he had reviewed the evidence and "the RFC assessment dated 6/24/11 [was] affirmed as written." (Tr. 295.)

In late September 2011, Debra Anderson ("Anderson"), Ph.D., conducted a neuropsychological evaluation of Padgett, with psychological testing confirming that attention was lower than expected for Padgett's educational level; memory was variable, ranging from moderately defective to normal; and testing showed mild depression. (Tr. 285-93.) Anderson reported that Padgett's cognitive complaints were "probably best explained as

- 11 -

being on the basis of psychological and other nonorganic variables such as sleep disruption," and recommended psychotherapy with a health psychologist who had an understanding of MS. She found that Padgett's cognitive functioning appeared to be generally good with the exception of psychologically-related attention and concentration fluctuations, which were "due to variables such as sleep deprivation and distraction, which in turn are likely to affect her day-to-day memory functioning." (*Id.*)

In late October 2011, Padgett was treated after falling down a flight of stairs. (Tr. 299.)

In December 2011, Padgett began psychotherapy with Hanson, who noted that Padgett had discontinued working due to her MS progression and had recently begun delegating tasks that she had not previously delegated. (Tr. 309-12.) Mental health notes reflected cognitive symptoms related to MS and sleep problems, physical symptoms, and that Padgett needed periods of rest. (Tr. 323-24, 327-28, 332-33, 335-36.)

In May 2012, Padgett had physical and mental ups and downs due to MS. On certain days she functioned normally, but on many days she did not. (Tr. 347-48.) In June she was forgetful with limited concentration. (Tr. 355-56.) Padgett continued to have Tysabri treatments, and with those came fatigue, weakness, fogginess, difficulty focusing and the recommendation of a cane. (Tr. 378-79, 382-84.)

- 12 -

In December 2012, Hanson completed an RFC, stating that Padgett had increased symptoms of depression associated with cognitive and physical limitations as result of MS. She reported that Padgett's condition was likely to decline, she would be seriously limited in her ability to maintain attention for two-hour segments, maintain regular attendance, complete a normal workday without interruptions, perform at a consistent pace without rest periods, and was unable to meet competitive standards. Hanson also reported that based on the unpredictability of Padgett's physical and cognitive symptoms, it would be impossible to maintain regular attendance and she would miss more than four days per month. (Tr. 389-94.)

In his evaluation of the medical evidence the ALJ did not acknowledge documentation of Padgett's fatigue, which conflicts with his determination that Padgett could perform a full range of sedentary employment. Although the ALJ relies on a lack of objective findings and a broad range of daily activities in discounting Padgett's complaints of fatigue, he does not mention that problems with fatigue pervade the record. (*See* Tr. 26.)

The ALJ found Padgett capable of preparing meals, cleaning, washing laundry, driving, shopping, exercising, assisting her stepfather (the ALJ is mistaken—the gentleman is Padgett's father, not her stepfather) with his cleaning business, or watching television. (*Id.*) The ALJ's summary leaves out the details of Padgett's activities.

As an example, Padgett testified that she cooked in ten- to fifteen-minute stages, then rested, then returned to cooking easy recipes. (Tr. 76-77, 203-11, 369-76.) Padgett only drove or went grocery shopping if she was having a "good day." (Tr. 72-73.) Padgett testified that she read only on "good days," using the computer about 15 minutes per day, and reading email once per month. Padgett went out to eat once or twice per month and saw a movie about five times in the previous six months. (Tr. 67-68, 70-72, 203-11.) Padgett's father informed the ALJ that Padgett had to cancel two out of eight cleaning obligations during the preceding two months due to her impairment. (Tr. 223-24.)

The ALJ also commented that Padgett's activities of daily living included a four-day "road trip." (Tr. 26.) The issue was not discussed at the hearing; however, in her memo to the Appeals Council Padgett explained that the trip did not involve constant driving and that she slept in the car while her husband drove the two eight-hour legs of the journey to Lincoln, Nebraska and back. (Tr. 235.)

When considered in full context, Padgett's activities are not inconsistent with the objective records, nor do they demonstrate the capacity to perform sedentary employment. As has been emphasized, an ability to engage in sporadic activities does not equate with the ability to work eight hours a day, five consecutive days of the week. *See Roddy v. Astrue,* 705 F.

3d 631, 639 (7th Cir. 2013) ("[w]e have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time"); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ failed to consider the difference between a person's being able to engage in sporadic physical activities and being able to work eight hours a day five consecutive days of the week).

Khatri's March 2010 recommendation regarding exercise also went unmentioned by the ALJ. While the ALJ need not discuss every piece of evidence, that recommendation should have been considered given that he cited to the fact that Padgett "exercise[ed] (lifting weights, riding a bicycle, and other cardio training)" when he found that Padgett's activities of daily living "suggest far better functioning than testified to" by her and her husband. (Tr. 26.) It makes a difference when exercise is pursued at the direction of a treating physician. *See Carradine*, 360 F.3d at 755 ("Since exercise is one of the treatments that doctors have prescribed for Carradine's pain, and she does not claim to be paralyzed, we cannot see how her being able to walk two miles is inconsistent with her suffering severe pain."); *Johnson v. Colvin*, No. 13-C-1023, 2014 WL 2765701, at \*6 (E.D. Wis. June 18, 2014). Context matters: the ALJ's decision does not demonstrate a balanced consideration of the evidence—missing is consideration of the

- 15 -

evidence favoring Padgett and reasoning for discounting it. Instead the ALJ's discussion is skewed and selectively cites evidence that favors his conclusion.

The ALJ also gave Hanson's opinion little weight, stating that the doctor provided limitations which were outside her realm of expertise. (Tr. 24.) The ALJ then rested the rejection of the opinion in large part on Padgett's daily activities which, as discussed above, were not properly considered. *(Id.)* Additionally, while Hanson's treatment notes reflect improving depression, they consistently reflect cognitive issues related to MS. (Tr. 323-24, 327-28, 332-33, 347-48, 355-56.)

In making the RFC determination, the ALJ must determine and articulate the weight applied to each medical opinion. SSR 96-8p. A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. *Roddy*, 705 F.3d at 636; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). In this case, the ALJ erred when he failed to provide "good reasons" for dismissing Hanson's opinion and there was no alternate opinion which he then adopted. *See Bates v. Colvin,* 736 F.3d 1093, 1101 (7th Cir. 2013) (remanding where no medical opinion from consultative physician or other medical evidence to support ALJ's findings regarding limitations).

- 16 -

Case 2:14-cv-00591-PP   Filed 09/30/15   Page 16 of 18   Document 20

As to the statements of Padgett's father and aunt, the ALJ gave them minimal weight because they were not submitted under oath. (Tr. 27.) However SSR 06-3p does not contain an oath requirement. Section 404.702 of the Title 20 of the Code of Federal Regulations provides that evidence includes a "signed statement," and 20 C.F.R. § 404.1512(b)(1)(iii) states that evidence includes statements the claimant "or others make about your impairment(s), your restrictions, your daily activities, your efforts to work."

The ALJ also stated that he gave minimal weight to the statements of Padgett's father and aunt, as well as to the pre-hearing statements and hearing testimony of Padgett's husband, because they are not disinterested parties and are not medical professionals. (Tr. 27.) These observations are not particularly dispositive. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not find a witness's testimony not credible simply, for example, because the witness is friendly with the claimant.)

Additionally, the statements and testimony of Padgett's father, aunt, and husband are not inconsistent with the record. While Padgett's MS was characterized as stable, her symptoms were not. Padgett's complaints of fatigue and weakness are documented in the record. Padgett's medical records reflect that when she was treated with injection therapy she reported subjective complaints of fatigue, weakness and/or urinary incontinence, and Padgett testified to "good" and "bad" days occurring throughout the month.

- 17 -

Case 2:14-cv-00591-PP   Filed 09/30/15   Page 17 of 18   Document 20

(Tr. 378-79, 74-76, 203-11, 369-76). The ALJ failed to establish any inconsistency with the record.

As a result of the foregoing errors, the ALJ's determination that Padgett is not disabled because she can perform her past relevant work, or in the alternative a significant number of jobs in the national economy, is not supported by substantial evidence. Therefore, pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this Decision.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Padgett's appeal is **GRANTED**;

Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **REVERSED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Decision;

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2015.

**BY THE COURT:**

*[signature]*

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**